# IN THE UNITED STATES COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LLEWELLYN GRIFFO,     )
                                  )
      **Plaintiff,**           )
                                  )
      **v.**                   )     **Case No.  10 C 2397**
                                  )
**MICHAEL J. ASTRUE,**     )     **Magistrate Judge Morton Denlow**
**Commissioner of Social Security,**  )
                                  )
      **Defendant.**         )

## MEMORANDUM OPINION AND ORDER

Claimant Llewellyn Griffo ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for supplemental security income ("SSI").  In response, the Commissioner moves for summary judgment.  Claimant raises the following issues in support of his motion: (1) whether administrative law judge Percival Harmon (the "ALJ") properly weighed the medical opinions when determining Claimant's exertional residual functional capacity ("RFC"); (2) whether the ALJ relied on jobs with requirements beyond Claimant's mental RFC; (3) whether the ALJ erred in denying Claimant's request for a consultative psychological evaluation to assess a potential learning disability; and (4) whether the ALJ erred in finding Claimant's testimony less than credible.  For the following reasons, the Court grants Claimant's motion for summary reversal or remand,

denies the Commissioner's cross-motion for summary judgment, and remands the case to the Commissioner for further proceedings consistent with this opinion.

## I. BACKGROUND FACTS

**A. Procedural History**

Claimant initially filed for SSI on January 31, 2006, alleging a disability onset date of May 13, 2005. R. 191, 199. The claim was denied on June 7, 2006. R. 117. Claimant then filed a request for reconsideration, which the SSA denied on September 19, 2006. R. 123. On November 14, 2006, Claimant requested a hearing before an ALJ. R. 127.

On February 18, 2009, in Chicago, Illinois, a hearing was held before ALJ Percival Harmon. R. 41–114. Claimant appeared with his attorney, Deborah Specter. Several witnesses testified: Claimant; his mother, Debra Griffo; medical expert ("ME") Hugh Savage, M.D.; and vocational expert ("VE") Glee Ann Kehr. The ALJ issued an unfavorable decision on June 30, 2009, finding that Claimant was not disabled under the Social Security Act. R. 9–21. The ALJ found that Claimant has the RFC necessary to perform a significant number of jobs in the national economy. *Id.*

Claimant subsequently requested review by the Appeals Council. R. 5. On March 11, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 1–4. Claimant then filed this action for review pursuant to 42 U.S.C. § 405(g).

**B.     Hearing Testimony—February 18, 2009**

**1.     Llewellyn Griffo—Claimant**

At the time of the hearing, Claimant was thirty-six years old, single, and living with his mother.  R. 48–49.  Claimant was five feet seven inches tall and weighed 265 pounds.  R. 50.  He completed education through the eighth grade.  R. 49.  Claimant testified that he cannot read, write, or count change.  R. 50.  When later asked by counsel to clarify his reading ability, Claimant affirmed his lawyer's statement that he could read "a little bit" and "recognize certain words."  R. 79.  He said that he had a driver's license, but that his aunt had taken the written portion of the test for him.  R. 67.  Claimant's past work experience included working as a picker and packer, and as a fast food worker.  R. 51–55.  He had been incarcerated for possession of a controlled substance in 2005 and 1992.  R. 56.  He stated that he had not used drugs or alcohol for the last three or four years. R. 57–58.

Claimant testified that he had been shot several times while selling drugs in late 2004.  R. 57.  He claimed to still have pain in his legs, ribs, and hands stemming from the gunshot wound.  R. 68–69.  He reported that his right leg swells whenever he stands for more than an hour straight, so that he must elevate his leg three or four times per day.  R. 71.  Claimant takes naproxen, Tylenol, and aspirin for pain.  R. 16, 86.  Claimant testified that he uses a cane to walk and can only go about twenty feet without stopping.  R. 73.  He said that his right wrist is numb.  R. 72.  Claimant stated that he could not carry

anything heavy because of back pain.  R. 74.  He had not yet started physical therapy or an exercise program, but was scheduled to start soon.  R. 84.  Claimant also stated that he was born with asthma, which has worsened over time.  R. 69.

Claimant does not help with any chores around the house, and spends all day watching TV.  R. 59. He needs help to put on his pants and shoes.  R. 72–73. He does not currently drive because of problems with his leg, but he can take the bus and train.  R. 58. He attends church twice a week: Thursday night from six o'clock to eight-thirty for bible study, and Sunday from nine in the morning to three in the afternoon.  R. 61.  At church, he sits on a bench and switches positions frequently.  R. 81.

### 2.      Debra Griffo—Claimant's Mother

Ms. Griffo testified that Claimant has lived with her on and off for his entire life.  R. 87.  Ms. Griffo's sister takes care of Claimant during the day, because Ms. Griffo has a job. R. 87.  Ms. Griffo was told that Claimant was a slow learner when he was in grade school, but she could not remember if he had been given any tests to determine a specific disability.  R. 87–88.  She did recall Claimant attending special education classes in eighth grade.  R. 108.  Ms. Griffo said she had seen Claimant read the newspaper and bible. R. 88–89.  She thought Claimant could count small amounts of money, but was unsure if he could count more. R. 92–93.

### 3. Dr. Hugh Savage—Medical Expert ("ME")

Dr. Savage examined Claimant's medical file and he determined that the file was adequately detailed to formulate a medical opinion about Claimant's condition. R. 94. He remarked that a notation in Claimant's treatment notes showed Claimant had used alcohol and cocaine just a few days before a doctor's appointment in August of 2007. R. 95, 631. The ME testified that Claimant appeared to have healed well from his gunshot surgery. R. 96. He thought that Claimant's recent complaints of persistent pain were inconsistent with Claimant's lack of previous complaints, the lack of any edema in his medical record, and his use of over-the-counter pain medications. *Id.*

The ME disagreed with the RFC evaluation of Claimant's treating physician, Dr. Akuche. R. 97. Dr. Akuche had indicated that Claimant needed to elevate his leg periodically and would have trouble standing or sitting for long periods of time. R. 97–98. The ME testified that no objective medical evidence in Claimant's record supported such conclusions. R. 98–99. For instance, the ME noted a physical exam, dated only a few weeks before Dr. Akuche's form, that specifically stated Claimant had no edema; this evidence undercut Dr. Akuche's opinion that Claimant needed to frequently elevate his leg. R. 99, 563. The same exam also found that Claimant had a normal range of motion in his upper extremities, calling into question Dr. Akuche's assertion that Claimant was limited in the use of his hands. *Id.*

The ME believed Claimant's RFC to be somewhere between sedentary and light. R. 99. Based on the consultative exam and treatment notes, he believed that Claimant could lift up to ten pounds frequently and ten to twenty pounds occasionally. *Id.* Based on Claimant's testimony about sitting in church, he thought Claimant would require sit/stand options every hour or two, simply to switch position for a minute or two. *Id.* He thought Claimant could stand for fifteen minutes at a stretch, and more than two hours total in an eight-hour work day. R. 103. He stated that Claimant's history of asthma would restrict Claimant from performing jobs involving extremes of temperature or pollution. R. 100. He testified that nothing in Claimant's medical history suggested limitations on hand use. R. 100. Concerning Claimant's mental capacity, he stated that it was "incompletely assessed" whether or not a learning disability played a role in Claimant's poor academic performance. R. 95.

### 4. Ms. Glee Ann Kehr—Vocational Expert ("VE")

Ms. Kehr testified that Claimant's previous work experience as a fast food worker and as a picker and packer was unskilled labor. R. 107. Before presenting his hypothetical to the VE, the ALJ discussed Claimant's educational background with the VE. R. 107–08. The ALJ presented the VE with a detailed hypothetical person based on Claimant's vocational profile and RFC. R. 109–10. The VE testified that the hypothetical person would be able to work as an account clerk, telephone clerk, or order clerk. R. 110. She stated there were 3,800, 4,700, and 8,000 of these jobs, respectively,

in the Chicago metropolitan area. *Id.* The ALJ then asked if the hypothetical person could still perform these jobs if he needed to elevate his leg for two hours during the day, take a five-minute break every thirty minutes, or could not sit for more than two hours in an eight-hour period. *Id.* The VE said that any one of these issues would, by themselves, preclude him from all three of the jobs. *Id.* The VE testified that a criminal background might preclude someone from being hired as an account clerk, but not the other two jobs. R. 112. The VE stated that none of her answers conflicted with information contained in the *Dictionary of Occupational Titles*. R. 111.

## C.    Medical Evidence

### 1.    2004 Gunshot Wound, Operation, and Follow-up

On November 9, 2004, Claimant was admitted to Cook County Hospital in critical condition suffering from multiple gunshot wounds to the thorax, abdomen, pelvis, right groin, and left buttock. R. 382. The trauma surgery team performed a laparotomy and repaired multiple small bowel, liver, and splenic injuries. R. 386. They removed a bullet from the iliac artery wall and repaired the artery. R. 387. Surgeons then performed a four-compartment fasciotomy on Claimant's right calf and a colostomy. R. 384, 387.

Claimant was released from the hospital on November 23, 2004. R. 520. He returned on December 9, 2004, for a skin graft to repair the fasciotomy wound on his right calf. R. 329–30. On February 15, 2005, Claimant visited Fantus Health Center for an outpatient checkup. R. 316. The notes from his checkup state that his fasciotomies

and right groin incision were well-healed, and the treating physician asserted that Claimant was "doing well." R. 316. Claimant returned to Cook County hospital on April 27, 2005 for colostomy reversal surgery. R. 353.

### 2. Examination While Incarcerated—September 24, 2005

On September 19, 2005, while incarcerated at the Illinois Correctional Center, Claimant complained of numbness in his right leg and stomach irritability. R. 283. X-rays revealed marked scoliosis of the thoracic spine. R. 305. During a physical examination taken at the prison on September 24, 2005, the attending physician found that Claimant's strength and range of motion in his lower extremities were within normal limits. R. 285. No edema was noted during the examination. *Id.*

### 3. Dr. Fauzia Rana—Examining Physician

On April 21, 2006, Claimant saw Fauzia Rana, M.D. for a consultative evaluation. R. 308. Dr. Rana noted that Claimant breathed loudly through his mouth; was grossly obese; offered very poor cooperation; and had high blood pressure, a history of drug abuse, and asthma. R. 309–11. Dr. Rana stated that she was unable to conduct a proper range of motion evaluation or neurological exam due to Claimant's poor cooperation. R. 310. Dr. Rana noted that Claimant had no lower extremity edema and normal use of his hands. *Id.* That said, Dr. Rana did observe slight scoliosis and weakness in Claimant's right leg, such that he needed to support himself with both hands when mounting and dismounting the exam table. *Id.*

### 4. Ambulatory and Community Health Network Visits 2007–2008

The record contains no evidence that Claimant sought treatment between his 2005 release from prison and August of 2007. R. 14. Progress notes from a visit to the Ambulatory and Community Health Network on August 28, 2007 mention a history of multiple asthma-related hospitalizations. R. 633. Notes from his physical exam that day show Claimant claimed scoliosis and a back pain rating of eight out of ten. R. 632. Claimant returned for follow-up visits on September 19, October 10, and November 27 of 2007. R. 628–30. Progress notes from these visits record "extremely" enlarged tonsils, hypertension, and wheezing. R. 629. During these four visits from August 28 to November 27, 2007, Claimant did not complain about leg pain or swelling. R. 628–30, 633. Claimant was a no-show for several subsequent appointments. R. 627. During his December 18, 2007 appointment and February 28, 2008 appointment, Claimant's main concern seemed to be his application for disability benefits. R. 627.

### 5. Dr. Uzochi Akuche—Treating Physician

Claimant's treating physician, Uzochi Akuche, M.D., completed a questionnaire on December 18, 2007. Dr. Akuche reported that he had three contacts with Claimant, lasting approximately thirty to forty minutes. R. 570. He asserted that Claimant experiences shortness of breath with exertion, daily back pain secondary to scoliosis, and decreased range of motion in his right leg. R. 570. According to Dr. Akuche, Claimant could only lift and carry ten pounds occasionally, less than ten pounds frequently, walk

half of a block without rest, sit for thirty minutes at a time, stand for no more than five minutes at a time, and sit/stand/walk for no more than two hours total in an eight-hour day. R. 570–72. The doctor wrote that Claimant experiences constant pain and needs a job that permits shifting at will, with five-minute breaks every thirty minutes, and the ability to elevate his leg for at least two hours every workday. *Id.*

## D.     The ALJ's Decision—June 30, 2009

After a hearing and review of the medical evidence, the ALJ determined Claimant had the RFC to perform a significant number of jobs in the national economy and denied Claimant's application for SSI. R. 11–19. The ALJ evaluated Claimant's application under the required five-step sequential analysis. *Id.* At step one, the ALJ found Claimant had not engaged in any substantial gainful activity since January 31, 2006, Claimant's application date. R. 11. At step two, the ALJ determined Claimant had the severe impairments of asthma, obesity, status post gunshot wounds, history of alcohol and drug abuse, hypertension, history of being a slow learner, and scoliosis. *Id.* At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. § 416.925–926. *Id.* The ALJ then proceeded to consider Claimant's RFC and found Claimant capable of the following:

> lift/carry 20 pounds occasionally and 10 pounds frequently; sit 6 of 8 hours in a workday; stand/walk 4 hours of 8 hours in a workday; unskilled routine simple work; occasional ramps/stairs but no ladders/ropes/scaffolds; no heights or hazardous machinery; occasional stoop, squat, crouch, kneel or

crawl but frequent balancing; need a single cane to ambulate; and avoid concentrated exposure to extreme cold and heat and fumes, odors, dusts, gases, poor ventilation, etc.

R. 12.

After considering the evidence, the ALJ found Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that his statements regarding "the intensity, persistence and limiting effects of these symptoms" were not credible to the extent they were inconsistent with the ALJ's RFC determination. R. 13–14. The ALJ found Claimant's report that he could not walk more than twenty feet or sit for more than one hour was inconsistent with other evidence in the record. R. 14–15. The ALJ cited a number of facts to support his findings on Claimant's physical capacity. For example, Claimant testified that he could use public transportation without assistance, and that he sat in church for over six hours every Sunday. R. 16. In evaluating the medical evidence, the ALJ found that the ME's medical testimony concerning Claimant's ability to sit and stand was more reliable than Dr. Akuche's opinion on this issue, noting the lack of objective evidence to support Dr. Akuche's assertions. R. 18–19. The ALJ observed that Claimant had little history of complaints concerning his ability to sit or stand, or concerning any leg pain or swelling. R. 14–15.

The ALJ also discussed Claimant's various other medical problems. The ALJ found that Claimant's testimony that back pain prevented him from lifting objects of light weight was not credible. R. 15. The ALJ based this opinion on the lack of medical evidence showing a history of back pain. R. 15. The ALJ found that the medical

evidence showed Claimant's asthma problems were minor, and could be accommodated by the environmental restriction in Claimant's RFC. R. 17. The ALJ found that Claimant's testimony that he had quit using drugs and alcohol in 2005 or 2006 was not credible, given that Claimant had reported drug use in 2007. *Id.* Regardless, the ALJ stated that Claimant's possible ongoing problems with drugs or alcohol were taken into account when precluding hazardous machinery or heights and reducing the RFC to only simple work. *Id.* The ALJ determined that Claimant had at least basic reading and math ability and found Claimant's claim of illiteracy to be not credible. R. 14. He nevertheless reduced Claimant's RFC to unskilled, simple, routine tasks. *Id.*

At step four, the ALJ concluded Claimant was not able to perform his past relevant work as a fast food worker or order picker. R. 19. At step five, the ALJ considered whether Claimant had the RFC, work experience, and education to find work in a new job. R. 20. Relying on the VE's testimony, the ALJ determined that Claimant could work as an account clerk, telephone clerk, or order clerk, and that significant numbers of these jobs existed in the national economy. *Id.* Because of his step-five finding, the ALJ concluded Claimant was not disabled under the Social Security Act. *Id.*

# II. LEGAL STANDARDS

## A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review.  *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000).  Under such circumstances, the district court has jurisdiction to review the ALJ's decision.  *Id.*  Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision.  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A "mere scintilla" of evidence is not enough.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  The ALJ need not address every piece of evidence or testimony presented, but rather must provide a "logical bridge" between the evidence and the ALJ's conclusions, so that a court can assess the agency findings and afford the claimant meaningful judicial review.  *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.     Disability Standard

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C.

§ 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

Social security regulations prescribe a five-step sequential analysis for evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v). Under this approach, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the burden shifts to the ALJ to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues for review: (1) whether the ALJ properly weighed the medical opinions when determining Claimant's exertional RFC; (2) whether the ALJ relied on jobs with requirements beyond Claimant's mental RFC; (3) whether the ALJ erred in denying Claimant's request for a consultative psychological evaluation to assess a potential learning disability; and (4) whether the ALJ erred in finding Claimant's testimony less than credible.

**A.      The ALJ Did Not Err in Determining Claimant's Exertional RFC.**

An ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). In doing so, an ALJ must determine what weight to give the opinions of the claimant's treating physicians.  20 C.F.R. § 404.1527.  A treating physician's opinion is entitled to controlling weight if supported by the medical findings and not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  An ALJ must offer "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  In other words, the ALJ must point to some "well-supported contradictory evidence" before discounting the opinion.  *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).

Here, well-supported evidence contradicted Dr. Akuche's opinion, and the ALJ found that Claimant's medical history was inconsistent with Dr. Akuche's RFC form.  Dr. Akuche stated that Claimant could sit for less than two hours during an eight-hour workday, must take unscheduled breaks every thirty minutes for five minutes at a time, experienced pain at a ten out of ten level, and would need to sit with his leg elevated for at least two hours per day to reduce swelling.  R. 570–71.  The ME disagreed with Dr. Akuche's RFC assessment, because the ME found that Claimant's medical history did not support it.  R. 98.  Unlike Dr. Akuche, the ME had access to Claimant's full medical

record when forming his opinion on Claimant's RFC. The ALJ observed that Claimant's medical record showed a lack of edema of the leg, that a 2005 examination showed that strength and range of motion in Claimant's lower extremities were within normal limits, and that no objective evidence supported Dr. Akuche's conclusions to the contrary. R. 14, 18–19.

The ALJ extensively reviewed the record, and found that the opinion of the ME had better support. R. 14–18. In addition to the factors listed by the ME, the ALJ pointed out that Claimant had no history of medical treatment between his 2005 release from prison and August of 2007. R. 14. During a series of doctor visits beginning in August of 2007, Claimant missed several doctor visits, resulting in "a sporadic outpatient follow-up that does not record any edema of leg and no significant history of breakthrough pain." R. 18.

If an ALJ provides good reasons for discounting a treating physician's opinion, he must decide what weight to give that opinion by considering the factors listed in 20 C.F.R. § 404.1527(d). *Campbell*, 627 F.3d at 308. These factors include (1) the length of the treatment relationship and frequency of visits; (2) the nature and extent of the relationship, including the treatment given and extent of any examinations; (3) the supportability of the opinion in light of medical testing and the explanation given by the physician; (4) consistency with the rest of the record; (5) the physician's specialization; and (6) any other factors tending to support or contradict the opinion. 20 C.F.R.

§ 404.1527(d)(2)–(6).

Claimant has raised no argument that the ALJ failed to consider these factors, and in any case, the ALJ seems to have sufficiently considered them even though he did not explicitly invoke the list. The ALJ noted that Dr. Akuche only met with Claimant on three occasions and cited no objective evidence to support his opinions. R. 17. The ALJ extensively examined the inconsistencies between Dr. Akuche's opinion and the record. R. 17–19. In sum, the ALJ did not commit reversible error in determining Claimant's exertional RFC.

**B.      The ALJ Insufficiently Assessed Claimant's Mental RFC.**

Claimant argues that the three jobs the VE testified Claimant could perform—account clerk, telephone clerk, and order clerk—are each beyond Claimant's general education development ("GED") level, and thus beyond his RFC. In support of this argument, Claimant points out that each of those jobs requires certain minimum reasoning, math, and language skills. *Dictionary of Occupational Titles* §§ 205.367-014, 237.367-046, 209.567-014, and App. C (4th ed. 1991), *available at* http://www.oalj.dol.gov/libdot.htm. If Claimant does not meet this baseline of skills for a given job, he would be precluded from the position.

Here, the ALJ did not formulate a sufficiently detailed RFC finding, thus leaving in doubt whether Claimant could meet the GED requirements of the jobs on which the step-five finding relied. Given Claimant's limited education and history of slow learning,

a question existed as to whether Claimant had the mental RFC to perform even relatively simple jobs.  It is not clear that the ALJ's RFC finding addressed this issue.  The ALJ did provide his reasons for finding Claimant "functionally literate" and did limit Claimant to unskilled, simple, routine, tasks "to accommodate his history of being a slow learner." R. 14.  But this analysis did not answer the more difficult question of whether Claimant met the specific GED requirements of the clerk positions referenced in the step-five finding.   Though the positions all qualify as "unskilled," they carry with them minimum language, math, and reasoning[1] requirements that may or may not correspond to the ALJ's idea of mere "functional literacy."  For instance, two of the positions require "level three" language skills, which, among other things, means an ability to "[w]rite reports and essays with proper format, punctuation, spelling, and grammar, using all parts of speech." *Dictionary of Occupational Titles* App. C.  Writing a report or essay may well exceed the ability of one who is merely "functionally literate."

Defendant stresses Claimant's work experience as substantial evidence that he was mentally capable of performing the clerk positions on which the ALJ relied, but the ALJ did not develop this argument in his decision.  Rather, he noted that Claimant's previous work as a cashier would have "required some basic reading and math skills."  The ALJ

---

[1] The Seventh Circuit has noted that jobs requiring "level three" reasoning skills—the same level required by the jobs at issue here—are consistent with an RFC limitation to simple, concrete instructions.  *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (citing *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007)).  But even assuming the RFC restriction here was analogous, questions remain about Claimant's language and math abilities, and the Court encourages the ALJ to make specific findings about all three GED categories.

did not compare Claimant's past jobs against other unskilled work with potentially different GED requirements.  R. 14.  In fact, the record may not contain sufficient evidence for the comparison, because the bulk of evidence about Claimant's work history comes from a relatively superficial work background declaration that Claimant filled out.  R. 243.  Ultimately, the ALJ's finding that Claimant had the mental capacity to perform any unskilled position was too broad a conclusion on a record that raised doubts about Claimant's level of education and ability to learn.  On remand, the ALJ should perform a more detailed analysis of Claimant's mental abilities and determine what GED levels Claimant can meet.

Claimant also argues that his criminal record rendered him ineligible for some jobs, but that fact is irrelevant to the disability inquiry, which merely asks whether Claimant is mentally and physically capable of working.  *Henderson v. Barnhart*, 349 F.3d 434, 435–36 (7th Cir. 2003).

**C.    The ALJ Should Consider Claimant's Request for a Psychological Examination.**

Claimant argues that the ALJ was required to order a consultative psychological evaluation to determine whether Claimant did or did not have a learning disability.  Claimant made several requests for a consultative examination, including a request during the Claimant's hearing before the ALJ.  R. 113, 264–65, 276.  The Court recognizes that an ALJ has considerable discretion in ordering consultative examinations, but the ALJ's decision here does not reveal whether the ALJ even considered the possibility.  And

Claimant correctly points out that a consultative examination is normally required when necessary evidence is absent in the records provided by medical sources. 20 C.F.R. § 416.919a(b)(1). Here, the ME stated that Claimant's learning disability was "incompletely assessed." R. 95. Perhaps a psychological or other examination would help the ALJ to answer the questions about Claimant's mental RFC raised in Part III.B. If so, then the ALJ should order the exam. Of course, the ALJ may determine that other methods of developing the record are more likely to produce useful evidence, or he may conclude that the record as it stands contains sufficient evidence to make the required findings. On remand, the ALJ should either order a consultative psychological or other examination or explain why an exam is unnecessary.

**D.    The ALJ Should Revisit His Credibility Finding in Light of the Remand.**

Claimant argues that the ALJ erred in assessing his credibility. An ALJ's credibility determinations deserve special deference, because only the ALJ observes the claimant testify. *Jones*, 623 F.3d at 1160. Rather than nitpicking for inconsistencies or contradictions, courts are to give a commonsense reading to an ALJ's opinion and to reverse credibility determinations "only if they are patently wrong." *Id.* Here, the ALJ may have erred in his assessment of the Claimant's credibility concerning illiteracy, and should revisit this portion of his credibility determination.

Claimant first argues that the ALJ erred in discounting Claimant's testimony concerning his level of pain. Specifically, Claimant contends that the ALJ improperly

relied upon evidence that Claimant had only used over-the-counter pain medication. R. 16. This argument fails for two reasons. First, pursuant to 20 C.F.R. § 416.929(c)(3)(iv), the ALJ was required to consider the type of medication Claimant used to help determine the level of pain that Claimant experienced. Second, the type of pain medication Claimant used was just one of several factors the ALJ considered when making his credibility determination. In addition to this one factor, the ALJ noted that Claimant's medical history did not include consistent complaints of severe pain, and that Claimant's daily activities were inconsistent with pain so acute that he could not care for himself. R. 14–16.

Claimant also argues that the ALJ erred when determining that Claimant's testimony about his illiteracy was not credible. Specifically, Claimant argues that the ALJ erred by assuming Claimant was asserting illiteracy, when the record shows that Claimant's counsel argued only that Claimant had a learning disability. When first asked whether he could read or write, the Claimant said that he could not. R. 50. Later in his testimony, however, Claimant clarified that he could read a little bit, and Claimant's attorney specifically stated to the ALJ that Claimant was alleging low intellectual ability, as opposed to illiteracy. R. 79, 108.

Given this clarification, the ALJ's "illiteracy" analysis appears to attack a straw man. The ALJ highlighted facts in the record that would contradict any claim of illiteracy, but he seemingly ignored the more difficult question about whether Claimant's

reading, math, and reasoning abilities would allow Claimant to perform the jobs on which the ALJ's step-five finding relied. R. 14. Of course, some of the same evidence that the ALJ relied on as proof of literacy may also bear on Claimant's capacity to perform those jobs, but it is not clear from the ALJ's decision that he conducted this analysis. In any case, the Court need not determine whether the ALJ's credibility finding was patently wrong, because the Court has already determined that a remand is necessary. On remand, the ALJ should revisit the credibility issue to determine whether Claimant was credible regarding his mental capacity.

## IV. CONCLUSION

**For the reasons set forth in this opinion, the Court grants Claimant's motion for summary reversal or remand, denies the Commissioner's cross-motion for summary judgment, and remands the case to the Commissioner for further proceedings consistent with this opinion.**

**SO ORDERED THIS 10th DAY OF FEBRUARY, 2011.**

_____
**MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Deborah Spector
Matt Gruca
Spector & Lenz, P.C.
20 East Jackson, Suite 1650
Chicago, Illinois 60604-2203

Counsel for Plaintiff

David R. Lidow
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604

Anne Kenny Kleinman
Assistant Regional Counsel
200 West Adams Street, 30th Floor
Chicago, IL 60606

Counsel for Defendant